May it please the Court, Chris Hallgren for the appellant. We've reserved five minutes for rebuttal. I want to thank the Court for the time and the attention to this case. We and a finding for us on either would require reversal of the lower court's opinion. The first topic is jurisdiction. The lower courts did not have jurisdiction to rule on the non-core state law issues of those purely under Texas state law, particularly when the claims at issue were permitted to pass through the bankruptcy proceeding under the confirmed plan of reorganization. We have some timelines here that I know are part of the record. Your argument regarding the Section 503 administrative claim, do I understand that that argument or that motion was submitted in the alternative to this pursuit in state court? It was submitted to reserve the state court. When the plan was confirmed, it allowed our rights to pass through. However, we still had to comply with the bargain. In order to avoid waiver, any allegation of waiver, we filed an administrative motion on six independent issues. But that includes what you're seeking in state court, your argument that you have a claim in state court, right? Yes, Your Honor. In that administrative motion, the relief we asked for was not a ruling on the non-production. But the non-production began after the filing of the bankruptcy. Is my timeline correct in that regard? Yes, Your Honor. So it's a post-filing claim that you would normally bring in state court? Yes, Your Honor. Exactly. It's a claim that we would have normally brought in state court. The production did cease during the bankruptcy, but here we did have our rights under our lease passed through. And then again, in an administrative motion, in order to avoid any allegation of waiver, the relief we asked for was not a payment from the estate. It was a reservation of rights that said, we intend under a threshold motion to go back to state court to have our rights determined. And if and only if we prevail and we're awarded damages that would constitute an administrative claim, then we want to come back to state court and have that adjudicated. So why would this not be a typical motion to modify, stay, and to liquidate claims in state court? Wouldn't that be the normal procedure, or am I misunderstanding? I think it would be if the plan had not already been entered and confirmed. Because the plan was confirmed, there was no stay in place. There was a plan, a plan of injunction, which Judge Isger said, in his opinion, had we not filed our reservation of rights, that we would have potentially waived our claims, that we would have expressly reserved and permitted a pass-through under the plan. And as such, similar to the N. Ray Blackwell case, which we cite in our papers, that is a case where a debtor filed an action in bankruptcy court that was predicated on another proceeding in a foreign jurisdiction, I believe a Cayman Island bankruptcy. And what the court there said was that that other proceeding, while it had not been filed yet, and the debtor said, hey, I'm going to file it, that's why my action in your court is ripe and can be reviewed. The court said, no, no, the relief you're requesting assumes there's actually an action pending somewhere else. And so until that occurs, there's nothing ripe for the court to review here. Similarly, because the relief requested was contingent on a successful result in ancillary litigation, until that litigation was successfully completed, there was no ripe issue for the court to hear in this case. Jurisdiction was a heavily contested issue, or heavily briefed issue. We had a status conference after all the briefing was on file. And that's where this idea of the futility briefing came up by the bankruptcy court. And it was a process where it was supposed to be originally on one discrete legal issue. There was no discovery, there was no depositions. And I know there's findings on factual issues that are in this record made by the lower courts, but there was never any evidentiary hearing or discovery opportunity for us to test any of that, or a fair opportunity to do any of our own arguments on this. Nevertheless, the court, when he announced this futility finding briefing schedule, he said that if he didn't find or if he found the claims to be futile, that they would be dismissed. If he found them to have some merit, then in his words, would have bigger fish to fry, i.e. the jurisdiction. That put the cart before the horse on the jurisdictional issue. And in his opinion, the bankruptcy court wrote that he had jurisdiction because, and I quote, because the MSB owners seek a distribution from EP Energy's bankruptcy estate. So I just quote, but again, we never did. We solely sought to preserve the rights granted to us in the plan. For these reasons, the court should vacate the orders and opinions of the lower court on the jurisdictional basis and order that the state law claims be adjudicated to finality in state court. However, if this court does reach the merits of the oil and gas claims themselves, we'd still ask that the court reverse lower court's decision. Because for having the, what the lower courts call the typical industry norms control over the words of the parties, as this court knows, and the Texas Supreme Court, and this court has said, it's the words on the page that matter. Even if one of the parties doesn't like the terms that it agreed to, or doesn't want to uphold them in the moment, because for economic reasons or otherwise, we're still required to do that. This court said that in Duke v. Sun Oil. Now, this case does involve a unique lease. It's a 70-page oil and gas lease. It's not a standard two-page lease that you would normally see, you know, that may have been common in the industry over the last number of years. And one of the things that the MSB owners negotiated for that is different is the role of production units throughout the time of the lease. Now, EP Energy points to cases, and I'll get into those details in a moment, about how those units are usually created after the end of continuous development. Here, they're created from the date of the first well. That's in paragraph 9 of the leases. And they start to work during the primary term of the lease, which is unusual, but it's what the parties agreed to here. During the primary term, the units had to stand or fall on their own. And again, these production units are an area of the lease to which a well is assigned. And EP Energy had to pay delay rentals for undeveloped acreage outside, but it did not have to pay delay rentals on production units. Those were held by production. However, if that production ceased, even during the primary term, EP Energy was required to timely commence operations to restore production, or they have to pay delay rentals, or that would terminate. This was carried through after the primary term. Instead of delay rentals, now it's continuous development holding the undeveloped acreage. But the production units still had to be separately maintained. When EP Energy decided to turn off production, it needed to find something in the lease that allowed those production units to continue to be in effect. In the record, saying they were going to cease all production based on the force majeure clause. We wrote a letter back, said that is not permitted under the terms of our lease. So if you do this, you're doing this at your own peril. Well, they did it anyway. And so for about a year, that's what the parties argued about. Eventually, EP Energy has abandoned that argument because the force majeure clause just simply doesn't fit. It wasn't until that hearing where I mentioned futility that we heard for the very first time this continuous development or the subsequent operations provision. But the court erred in how it construed that provision. First, it changed and to or. Because the provision says that if production ceases, this would be provision 11, subsection D. Is that temporary cessation? It's entitled subsequent operations. They refer to it as temporary cessation. And you're referring to and if production is restored? Yes, Your Honor. And the lower courts effectively changed and to or. Drilling and reworking operations or restart production. But the law is that the and shows what comes after. So those drilling and reworking operations require, have to end in production. An example of that cited by the district court would be Duke versus Sun Oil. It's a case from this court in 1963. And that dealt with what's called reed-type wells. That's the term that this court used in that opinion. Reed-type wells. And it referred to Gulf Oil versus Reed, Texas Supreme Court case. And it refers to a well that is being drilled prior to the end of the primary term, but isn't complete until after the primary term. And there's a delay in getting production started. All of those cases, including Gulf Oil, primarily dealt with the payment and timing payment for delay rentals. Excuse me, not delay payments. Which were not made here. That's not an issue in this case. But what the court said, the district court in this case said, well, if you look at Duke, it says drilling and reworking operations and if production is resumed, then you hold the lease. Similar to ours. He said, it's the same thing. And he concluded that meant all three were an option. However, in those cases, in what he said, what this court said in Duke Oil was, when you're conducting drilling and reworking operations, and then you cease those operations, you have to then timely resume those operations again or get to production. So all of those cases, the Sanchez O'Brien case that they cite, the Skelly Oil case, these were all Reed-type wells. And they all involved production, excuse me, shut-in royalty payments and the initial production from a well. Which is distinct from here, where these wells have been producing for years. The court also erred in not finding this to be a special limitation. A special limitation, again, when you have the phrase shall terminate unless. I'm sorry, back to the subsequent operations clause. I'm reading and I have it right here. It says, if production should cease from any production unit, this lease shall terminate as to all lands and depths included within such unit unless, lest he commences drilling or reworking operations on such unit within, et cetera, et cetera, et cetera. And then there's a semicolon, and if production is restored. That's what you think that the Bankruptcy Court and the District Court misinterpreted. And if production is restored from such unit, this lease shall remain intact. That's correct. Okay, what is such unit then referring to? Because they're all referring to such units. The beginning of that sentence is talking about a production, any production unit were to cease. So it's talking about, that such unit is the production unit in which production ceased. Okay, so such unit. And if production is restored from such unit. In other words, the unit on which production ceased. Yes sir. Did that not happen here? Well, it didn't happen as a result of drilling or reworking operations. Well, it doesn't say that. Well, it doesn't say, and if production is restored from such unit, as a result of commencing drilling or reworking operations. It just says, and if production is restored from such unit. Again, and I believe the law though is, when you have the word and here, you have to look at what comes before, because it's not an or, it's providing a standalone option, which again is error. What it says is, and this is again, similar to the Duke versus Sun Oil case, where it's saying you have to timely commence drilling or reworking operations. And if you restore production, again, referring to production from those. What were they supposed to do then? Okay, so they stopped producing, saying price of oil plummeted because of COVID, right? Stopped producing. But with respect to the unit that they stopped producing, they started again, right? Within 30 days? Again, that's what they claimed. There weren't a lot of new discovery there. What were they supposed to do in order to come within this clause? Well, if they want to rely on this clause, it requires timely drilling or reworking operations. Again, this was an intentional voluntary shut-in by EP Energy. And when they made that decision- They would have to rework. But there was already a well. Why would they have to rework the operation? And then what would sense would that make? I'm trying to figure out what would they have to do? They stopped production. I understand the allegations. They stopped production because of this catastrophic plummeting in oil prices. Then they started again. But you said that doesn't trigger the clause. What were they supposed to do to trigger the clause? Well, think of this situation. They tried to shoehorn this clause into a situation where they- No, just what were they supposed to do to trigger the clause? They were required to commence drilling and reworking operations within 120 days of the cessation of production. That's the situation that this provision is designed to do. As the Texas Supreme Court said in the Endeavor Resources versus Discovery Operating case, where there was the dispute was what acreage was held under the retained acreage clauses. And the key to that case was what had been designated by the railroad commission. And one of the parties said, that's a railroad commission. That has nothing to do with title. And the Texas Supreme Court said, okay, that may be true, but that's the construct that you agreed to. So if you're going to rely on this clause, you have to agree to it the way you wrote it. And that's what we say here. This was all a heavily negotiated lease. And this clause, if you want to rely on it, was written the way it was written. And if EP Energy wants to rely on it, then they need to comply with the express terms, as this court said in Duke-Sun Oil, even if the feasibility or economic conditions is no excuse. Can we talk about the jurisdiction argument again? Yes, ma'am. Well, first of all, can we talk about this motion and your opposition to us looking at a transcript? That transcript is already in the record. I don't understand the opposition to them submitting it to us when it's already part of the record. It's not some secret proceeding in some other case. This is in this case. True. The standard, we don't believe that their arguments met the standard for supplementation of the record at this point. It wouldn't need to be supplemented. It's already a transcript from this case. Understood, Your Honor. If it's already in the record, and I guess maybe both sides didn't recognize that to say we're moving to supplement. I mean, it's not in the record excerpts, if that's what you mean. But that doesn't, the record excerpts are not the sum total of the record. Why don't you not want us to read that? Well, Your Honor, it's not necessarily that we do. We read it, by the way. I mean, maybe someone did. Okay. Your Honor, we have no opposition to the court reading it. The biggest issue to us was the timing. I want to ask about the timing now. So that's, when did you first say, Your Honor, you can't deny the claim because you don't have jurisdiction. This is one of those Texas claims, and under all the progeny of the other famous bankruptcy case, you can't do this. We have to send it to Texas court, or else they have to withdraw the reference and see if they can hear it, and all of that sort of thing with the jury and by grievance or something. So why did you, when did you first object to the claim being denied and say that the court could not deny the claim? It was in our briefing. Well, one, in the administrative motion itself of the court, this found jurisdiction. We said this was passing through because it wasn't within the jurisdiction of the court. When was that? When was it the first time that you, I'm sorry, it's going to be a little bit slow here for a minute, and this doesn't count against your rebuttal. I believe that would have been October 30th or 31st, or excuse me, October 30th when we filed our administrative claim reservation. That was the day before the bar deadline. We also filed a brief of lack of jurisdiction on January 29th. This was prior to the status conference that we had where the court announced that it would do this futility briefing schedule. Okay. But whenever, there was nothing said at the time that the plan was confirmed. That, oh, by the way, we're still objecting to that or anything was there? No, Your Honor, nor should we need it to because our rights are passing through. So when it said that we were retaining all of our rights under our leases and the plan itself would not be diminishing our rights under the plan. Well, but that has already been denied. So you didn't have a right under the plan. I'm sorry, what had been denied? Hadn't the claim been denied? It was not just abstained from, it was denied. No, Your Honor. We're talking about the state law claims that you're on today. The plan was entered in October, beginning of October of 2020. And that's where our claims were permitted to pass through. 30 days later, we filed our administrative claim motion and reservation in order to get the bar date. It wasn't until the following March of 21 that the futility motion was requested. During that interim, there were several briefs filed on jurisdiction and objecting to jurisdiction. The claims are not denied until, I believe, December of 21. December of 21, denied? Yes, Your Honor. Okay. Okay. Thank you. Thank you.  May it please the Court, by pausing production when the oil market collapsed during its bankruptcy, EP made money for MSP and preserved value for the bankruptcy estate according to its context and purpose of the leases, confirmed that the lower courts got it right. The leases were maintained by their terms through that pause in production. Despite being better off through higher royalties because of that decision, MSP wants the big windfall of divesting EP's estate of its title under the leases. But the Texas Supreme Court says, under the rule against forfeiture, that you can't divest an oil company of its rights under a lease unless the text is so clear, precise, and unequivocal that there's no other way to read the lease. Are you going to do injunction? I mean, are you going to do jurisdiction? Yes, Your Honor. I can skip right to it. I'll start with jurisdiction. We've got to ask the question, from where does this appeal originate? What's the origin of this appeal? It's a bankruptcy court order with a narrow scope. Judge Isker denied MSP's administrative priority claim, which was brought against EP's bankruptcy estate under 11 U.S.C. section 503. It was not a reservation. It's in the record at page 15187. And in that filing, which is titled An Application for Administrative Expenses from the Bankruptcy Estate, here is, I just pulled the page, here is MSP's conclusion at page 15206. The MSP owners are accordingly entitled to preservation and full payment as applicable to an administrative expense claim under section 503 of the Bankruptcy Code. That is the touchstone of this court's jurisdictional analysis. And Judge Engelhardt, you're exactly right on the timeline of when that happened. It's seeking the payment of money for damages that allegedly accrued post-petition and pre-effective date. That bears all of the hallmarks and essence of an administrative claim. And for some language that helps with that touchstone, there's a great passage in Stern v. Marshall, where Chief Justice Roberts is quoting Katchen. He who invokes the aid of the bankruptcy court by offering a proof of claim and demanding its allowance must abide by the consequences of that procedure. That's this case in a nutshell. MSP took their state law theory of relief for trespass damages, closed it in the vehicle of 11 U.S.C. section 503, and affirmatively presented it to the bankruptcy court and said, judges, we want you to allow us money from the estate. That affirmative action step by MSP triggered the procedure that ensued, and MSP must abide by the consequence of that procedure. But MSP did more than simply file that claim and present it to the bankruptcy court. After telling the bankruptcy court that MSP thought that claim was worth $100 million or more from EP's bankruptcy estate, MSP used that allegation as leverage to ask the court to freeze the estate's assets pending the merits determination of the administrative claim. MSP told the court, quote, you have the jurisdiction to enjoin the estate from distributing assets until this claim is decided. And the court gave MSP that relief. That's the freeze order that's at Appellee's Record Excerpt 2. The court enjoined the estate from distributing assets from a potential sale pending the merits outcome of this claim. It was only after MSP lost on the merits that MSP now turns around and says, whoa, never mind. You didn't have jurisdiction. You only had jurisdiction we wanted to leverage, but now that we lost, we're going to challenge jurisdiction on appeal. But there's a great passage in Ellis v. Westinghouse, the Third Circuit case that we cite that says, an administrative claim, it can't be a chameleon. It can't be an administrative claim when it for purposes of leverage. And then, poof, transform into not an administrative claim when you've lost on the merits. And you don't want the bankruptcy court to have the power to answer the question anymore. But turning to more of the statutory and textual hook for the bankruptcy court's jurisdiction, it's in 28 U.S.C. Section 1334B, arising under jurisdiction. Why is it arising under? Because, again, MSP took this state law theory and put it in the vehicle of 11 U.S.C. Section 503. That is a creature of Title XI. It exists only in the context of bankruptcy. That makes it a claim that arises under Chapter 11 and gives jurisdiction under 1334B. Buttressing that reality, we have 28 U.S.C. Section 157B2B, which expressly lists as a core power of the bankruptcy court, its peculiar power, the allowance and disallowance of claims against the estate. And when we really ask, what did Judge Isker do here? That's what he did. He disallowed a claim against the bankruptcy estate. The opinion is very careful on this point. If you go and look at the order that Judge Isker entered, it's at Appellee's Record Excerpt 3, the final page in that excerpt. The order says that capital T temporary cessation claim is denied. That term, capital T temporary cessation claim, is defined in the opinion to mean the administrative claim brought under Section 503, which sought damages accruing post-petition and pre-effective date. So what is MSB really asking on jurisdiction? Because we're hearing a lot of arguments about abstention, deferral, ripeness, all of those arguments. They really don't sound in a contention that a bankruptcy court doesn't have jurisdiction to adjudicate an administrative claim. Because that's really beyond question. Of course it does. Those are arguments for permissive abstention. Those are arguments that, yeah, yeah, we know that a bankruptcy court has jurisdiction to decide a claim under 503. But on this claim, we think you should have held off and let us go down to state court and then come back to you. A couple of problems with that. Number one, MSB asked for permissive abstention below. They asked Judge Isker. He said no and wrote reasons in the opinion. They appealed that to the district court. Judge Eskridge affirmed Judge Isker's discretionary termination with a very detailed ruling. And then MSB stopped appealing. They forfeited that issue in their briefing to this court. Permissive abstention is not a live issue in this appeal. Which is odd because that's really the bucket where all of these arguments belong. Is, yeah, yeah, we know you have jurisdiction over a 503 claim. But because of these facts and circumstances, we think as a prudential matter, you should have abstained. If they hadn't made the decision to put it in the bucket of a claim, it would be a Texas issue that would have gone to Texas, wouldn't it, if they hadn't dressed it up in that way? If they hadn't, so if they took the exact same claim and said, we don't care what the plan is, we'll take our chances. We might run afoul of Judge Isker's plan, but we'll take our changes. And they filed that claim exactly as they did in state court. EP would have removed it to the bankruptcy and it would have been a very strong case of related to jurisdiction that very likely would have violated the plan. Because it saw the portion of damages arising from post-petition and pre-effective date, that is a capital C claim against the estate. Because it seeks money from the estate arising during the administrative period. So it's not under 503, but it's a different way. The theory would be Judge Isker enjoined and discharged those damages in effectuating the plan. So because that claim would have included that portion of the damages, because if they just took the exact same lawsuit and filed it, it would have violated the plan. And that certainly would be arising under jurisdiction because the bankruptcy judge has jurisdiction to enforce his own orders under the plan. But at a minimum, it would be a very strong case of related to. I know it's not your job to try to construct how they could do their claim, that's a fact. But they could carve out that time period though? Yep. So they could carve out that time period and say, we're not saying during the time of the plan being administered, but we have one before and we'll have one after and gone to state court with that. Yep. If they had done that, which is, we're now at the furthest, the outer bounds of what this argument could be. If they had carved out every little piece that really touches bankruptcy, maybe we're in a world where I think it would have been removed, we'd have a fight over related to jurisdiction, but maybe we've now reached the outer bound. And that's the scenario where they can actually bypass Judge Isger and go have this lawsuit in state court. But for this court's purposes, that's not what they did. The analysis is much more straightforward, because not only did they not carve out and create that scenario, they didn't even create a scenario where we're arguing about related to jurisdiction. They affirmatively put the claim into 503 and presented it to the bankruptcy court that way. Which, turning back to Chief Justice Roberts' line in Stern, they have to abide by the consequences of that procedure. If I may with the... It's not really that they forfeited, it's that they intentionally brought. Correct. Correct. Because are you... Is it your position that they would have had to argue it some more in order to not forfeit it? I understand you think they forfeited the permissive abeyance or whatever that's called. But they didn't forfeit their argument that there was no jurisdiction. They actually pressed the case. That's right, Your Honor. They haven't forfeited the question of does a bankruptcy court have 1334B jurisdiction over an administrative claim brought under 11 U.S.C. Section 503. That question is live before this court, but the answer to that is very straightforward. Here's what they have forfeited. They forfeited in the motion to supplement the record. Here's what they forfeited on that front as relates to the jurisdictional analysis. If MSB's argument is that the bankruptcy court erred by including a bar date in the plan or putting the bar date at 30 days after the effective date or including any provision in the plan, that argument has been forfeited for a couple of reasons. Number one, MSB asked for a lot of that language to be in the plan affirmatively. Number two, MSB didn't object to the plan. And so hearing about this for the first time on appeal, that argument is forfeited. So if it sounds in some type of error by the bankruptcy court in what's included in the plan, not live. But you're correct, Your Honor. The bare question of does the bankruptcy court have jurisdiction to adjudicate a 503 claim, that is live. It hasn't forfeited and we're arguing about it today. With my time remaining, I'll touch very briefly on the fairly dense oil and gas lease interpretation issues. At the top, there are three components to a lease construction analysis. You've got to look at the text, the context, and the purpose, the utilitarian purpose of a lease. First on the text. That's the plain grammatical language of the provision. But in this case, because MSB seeks lease termination, there's sort of a special caveat, which is that we must read the lease through the lens of the rule against forfeiture. We've got to ask, is it necessary to read the lease in a manner that results in termination? Number two on context. That's the context of the broader lease. We must harmonize all of the provisions. We look at the text of the provision that issue, but it has to be in harmony with all of the provisions of the lease to ensure that nothing else is rendered meaningless by the interpretation of the determined issue. And then finally, the purpose. The court, as part of that analysis, expressly as part of that analysis, the court reads from a utilitarian standpoint, bearing in mind the purpose to be served and avoiding unreasonable results. That's in Devon versus Shepard just a year or two ago at the Texas Supreme Court, which reiterates something that has long been the law in the Texas construction analysis. On the CD leases, applying that analysis to the continuous development leases, three quick points. First, the text, context, and purpose of the lease grant EP the broad right in paragraph eight to drill anywhere on the lease premises, quote lease premises, to fully develop, quote, all the lease premises. And that's a defined term, lease premises. It means all of the lands covered by the point. Number two, MSPs reading would severely limit that broad grant. In the words of judges, her would eviscerate that broad grant, but there's no textual basis to do that. There's no textual basis to amend paragraph eight to replace the term lease premises, which is defined with MSPs invented term of undeveloped acreage, which is not only undefined and at least it's not even mentioned in the lease. And then three, as a practical reality, the continuous development argument is fairly late coming in the process. MSB has stood by and watched EP drill hundreds of horizontal Eagleford oil and gas wells over the past more than a decade. And in fact, MSB agreed with the lower court's reading in a letter that's in the record at page 15345 that one well holds the entire lease. That's MSB's words, not mine. And so it's the punchline of the CD analysis is it is not necessary to read the CD clause to result in termination in light of that broad grant under paragraph eight. Counsel, if we do get to the merits, are we required to both consider the continuous development clause and the subsequent operations clause because they apply to different leases? Yes, that's correct. There are two different leases fall in different categories. The CD leases are maintained by the CD clause and they never reached the held by production phase. And then the held by production leases have progressed through continuous development and they're now held by the temporary cessation clause, which I'll turn to in just a moment. So turning that way, the held by production leases, three points on this as well. The text, context, and purpose of the lease is confirmed that restoring any production by any means is the key to maintaining the lease under the habendum clause. And Judge Duncan, you hit the nail on the head. That includes production from a newly drilled or reworked well, but it's not limited to it. And to further underscore your honor's point, the parties knew how to limit it in that way. They did it in the subsequent sentence. They used the phrase, if a well is drilled or reworked resulting in production and so on and so forth. But they didn't say that in the sentence that we're focused on. They just said, and if production is restored from such unit. Yeah, I don't know that I understand it, but I was trying to tease out the implications of the idea that, and if production was restored from such unit, that refers only to, I guess, a unit where the lessee has commenced drilling or reworking operations. I just didn't understand how the terms fit together. Such unit. They focus on and, I get that. They think it's, okay. But the use of the word and confirms that the semicolon followed by and confirms that. I just think putting huge amounts of weight on semicolons and ands and ays. I know the Supreme Court's fond of doing that, but I find that, I like to situate the language in a larger context and just saying, well, what does and mean? All of a sudden we turn into philosophers and we're not. Let's do that. Let's put it in a larger context. Let's talk about, I'll talk about the practical realities first, and then I'll come back around to harmonizing entirely. Practical realities. Wells routinely pause production for all kinds of reasons that don't require downhole operations. For example, if you're fracking a neighboring well, you might stop production to frack. But there's an environmental spill on the surface. There's a pipeline leak. The first case that was If that pipeline has a leak or has some issue where it can't take on capacity, the operator might might pause production temporarily until that issue gets through. You're not going to talk about ancient China, are you? If there's a blowout, if there's a fire, or take the example from the briefing, winter storm Uri, which shut down power for all of South Texas. All of the wells in South Texas stopped producing temporarily until the power came back. In all of those scenarios, and let focus on the Uri example. Under MSB's reading, all of the leases and units would terminate unless EP brought out a rig, which is a very expensive, and you can't like get on Uber and order an oil rig to a wellhead, unless EP brought out a rig and conducted 75 instances of unnecessary perfunctory downhole operations that are very expensive. That's the only way, and my colleague Mr. Halgren said it himself, that's what they would require. That we bring out a rig and go downhole on each and every affected unit. That reading is not necessary given the lower course reading. It's certainly not economical. It doesn't serve the utilitarian purpose of the lease to produce oil and gas and make everybody money. And it's not a reasonable reading of the lease. And so I'll close very briefly. Again, EP's decision made money for MSB and preserved value for the bankruptcy estate according to its fiduciary duties. Both of the lower courts conducted a careful, exacting textual analysis before denying MSB a massive windfall based on unreasonable readings of the lease. The lower courts had clear jurisdiction under 1334 to disallow MSB's administrative expense plan brought under 11 U.S.C. Section 503, and EP would respectfully urge this court to affirm. Thank you. Can I ask you, these are in the record that the other side submitted, these oral argument demonstratives. Are they in the record or are they not in the record? No, Your Honor, that's not in the record. That's a new demonstrative that was created and served three days ago on Friday. So this is not just a copy of something that I could find in the record that's readily available. This is a new created document. That is a new created document, Your Honor. And I'd be glad, there are, suffice it to say, there are advocacy representations in that document and representations of fact with which we would disagree. Let me count the ways. But suffice it to say, it's not in the record. Okay. Thank you. Are other courts doing these a lot these days, these oral argument demonstratives? Does the Texas approved court have these? Why are we getting some of these? I'm going to ask you this because you're the one who submitted these. Your Honor, I can offer my personal You're an experienced advocate. I want to know why you're getting these sometimes now. Occasionally. My personal view of that is that occasionally, in the occasional case, if it is helpful to the panel to have some type of visual demonstrative or timeline that would help walk the panel through an oral argument, then it might get submitted. It's fairly rare that it's the case that that is inappropriate. Well, at least in this case, it was submitted several days ahead of time and not dropped on you at the moment you sat down at the table. So that's a positive thing. No complaints. Thank you. And you feel free to answer the question too before your time starts. Yes, Your Honor. In my experience, yes, demonstrators are fairly routine, particularly in appellate courts and the Texas Supreme Court. Like here, our understanding was that they were permitted in this court so long and they were not to be filed. Instead, they were to be emailed as we did with a copy to opposing counsel before the day of the hearing. And you agree that this has argumentative points and it's just part of the timeline with record citations of where those events occurred. I'm not sure what is referring to as argument. Okay. You said time for rebuttal. Thank you, Your Honor. I'm going to start with the oil and gas side and with jurisdiction. But the issue on the oil and gas side is they made the decision to turn the wells off. So they have to find something in the leases that allows them to maintain them. And we don't believe that they did. Judge Duncan, you made the comment about the word and. I never thought we'd be arguing about the word and that as part of the bankruptcy court's opinion. When I read you have to start drilling and reworking operations timely and if production occurs from that unit, then you can continue to hold the unit. I read that to say, yeah, do your drilling and reworking operations. What about when the counsel invoked the rule against forfeiture, which would suggest a stricter reading to read the lease a little bit stricter in order to find a termination. What's your response to that? Sure. Although some cases may refer to forfeiture and special limitations. This is a special limitation, but they still have to be clear and unequivocal. They shall terminate unless meets that standard in the cases that have been cited where the courts didn't find an immediate termination. That's what a special termination is, or special limitation, where it happens automatically. And the courts that they cite, they say it wasn't as clear, it was ambiguous like Endeavor versus Energen. The court still said if you didn't comply with the provision, leases are going to terminate. It's just not going to terminate automatically. So it's still an issue. You have to go to court to get an order of cancellation. I heard the word purpose several times. In the Texas Supreme Court, just a few months ago, we had a letter brief on this in the American Midstream case. It says an unambiguous contract must be enforced as written and Texas courts are prohibited from adding words to carry out some purpose not dictated by the words on the page. It's a quote from the Texas Supreme Court case. And I want to touch real quick on the continuous development argument. They rely on Mayo, and they rely on Ramor. Both cases turned on the fact that production units weren't created until after continuous development. Here, we create them well before continuous development, including the primary terms. We have the opposite language. Judge Eskridge, in looking at that, said, OK, the language is different. But Ramor and Mayo show the typical use of these types of clauses. So that's what we're going to go with. That's error to use those cases, as the Supreme Court has said. Can't you say, well, what's typical? Let's do that. What did the leases say? We had the opposite language, and it should have had the opposite result. In regards to jurisdiction, our administrative claim motion snippet was read. This is what we said. For present purposes, this motion seeks to assert and thereby preserve an administrative claim status, should there be damages emanating during the separate cases from that separate litigation to come. We also said, if not all passing through, otherwise payable, as and when determined, i.e., in another case. Excuse me. And we later said, MSB owners contend the matters herein should pass through and be fully payable to the extent adjudication is needed in further actions. That's our relief request, and our order asks that our claim be committed to pass through. We never ask for a determination on the merits. We ask that they pass through. The freeze order that they call it, I want to address that. We didn't ask the court to make them freeze any payments. We knew that that was going to happen. It was in the news, and the relief we requested in our motion and in our order there moved to enforce the terms of the plan. As this court, Chief Judge Elrod, under Craig Storrs, the jurisdiction of post-confirmation is limited to matters pertaining to the implementation of the plan, and the plan required that they be able to pay all administrative claims. What we asked for was that they just tell the court that they're going to be able to do that if and when needed. When we said, you have jurisdiction, we meant you have jurisdiction under the plan and pursuant to Craig Storrs and your limited jurisdictional scope to enforce the plan and make sure they comply with it. That's all that that had to do with it. Finally, Chief Judge Elrod, you were asking about could we carve out these issues, and the answer from the other side was no, and Judge Israel also said the answer was no. He said if we had tried to do that, because there were potential damages during or prior to the administrative bar date, that he could have asserted jurisdiction had we done that and dismissed everything. He asked that question a few times to Mr. Cochran, and every time until the last one, he said, well, maybe they could have done it. Every other time, he said the second that we would have done that, we would have moved it to the bankruptcy court, and he would have dismissed it. He mentioned the LSU Westinghouse case. That's what happened in that case. An issue arose prior to the bar date, and the party did not file an action. Instead, they filed for administrative claims. Instead, they filed later, and that was barred, and so that's why we reserved our rights under the plan to file later. We could not have tried to carve anything out, and that was not voluntary. Thank you. Thank you. We have the arguments in this case. The case is submitted. The arguments have been very helpful. Thank you.